**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COLIN WELFORD, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 19 cv 7864 |
| | ) | |
| ELIZA TOUR LLC, a New York Limited | ) | |
| Liability Company, and the CHICAGO | ) | **PLAINTIFF DEMANDS TRIAL** |
| FEDERATION OF MUSICIANS, LOCAL | ) | **BY JURY ON ALL ISSUES** |
| NO. 10-208, | ) | **TRIABLE TO A JURY** |
| | ) | |
| Defendants, | ) | |

**COMPLAINT**

Plaintiff COLIN WELFORD, by his attorneys, and for his Complaint against Defendants

ELIZA TOUR LLC, (at times referred to herein as Eliza Tour or "the Hamilton Producers"), and,

the CHICAGO FEDERATION OF MUSICIANS, LOCAL NO. 10-208, states:

**Nature of the Case**

1.      Plaintiff Colin Welford, a world-renowned conductor, was hired by the producers

of the hit Broadway musical, entitled "Hamilton" (hereinafter "the Play") to occupy a key role

necessary for this acclaimed artistic work to reach a wider national audience beyond Broadway in

New York City. For this purpose, the producers created various commercial entities, including

Eliza Tour, for purposes of touring the Play to perform concurrently with the Play on Broadway.

The Eliza Tour and other touring companies of Hamilton have been, at all relevant times, operated

out of the same business location and by the same individual producers, officers and agents. After

nearly three years of exemplary performances, the Hamilton Producers abruptly terminated Mr.

Welford's employment on May 30, 2019, which they were not entitled to do pursuant to the parties'

written agreement.  Further, in violation of the applicable termination clause found only in the

1

subject collective bargaining agreement, which was incorporated by reference and provided to him at the time of entering his employment agreement, there was no "just cause subject to the grievance dispute resolution procedures" given for Mr. Welford's termination nor was Mr. Welford afforded an opportunity to participate in any "grievance dispute resolution" process prior to his termination or as otherwise contractually required. The union took no action on his behalf despite knowing these things but instead acquiesced. Mr. Welford, nonetheless, sought the assistance of the Chicago Federation of Musicians, Local No. 10-208, the union to which he had been paying dues for nearly three years based upon his work for the Play while in Chicago, to represent him as a unionized employee. However, the union has yet to assist Mr. Welford as required. Accordingly, Mr. Welford files pursuant to Section 301 of the Labor Management Relations Act suit against the Chicago Federation of Musicians, Local No. 10-208 for unfair labor practices including breaching its duty of fair representation, and against the Hamilton Producers for breach of his employment contract, violation of the Wage Payment and Collection Act, and will be seeking leave to amend this Complaint to add further claims, which include violations of Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967, as amended, upon exhausting his administrative remedies as required. Alternatively, to the extent Mr. Welford is not subject, or only partially subject, to the union's collective bargaining contract, Mr. Welford asserts state-law claims for fraud, breach of contract, and unjust enrichment.

## Jurisdiction and Venue

2.      This Court has jurisdiction of Counts I and II pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and 28 U.S.C. 1331 and 1337.

3.      This Court has jurisdiction of Counts III and IV pursuant to the supplemental jurisdiction of this Court by 28 U.S.C. 1367, over state-law claims.

4.     Venue is proper in this district because the actions giving rise to this lawsuit occurred in this District.  Additionally, Defendants are subject to personal jurisdiction in the Northern District of Illinois as they do business in Chicago, Illinois, and have committed all or a substantial part of the unlawful acts alleged herein within this district.

**Parties**

5.     Plaintiff Colin Welford is a U.S. citizen and a resident of Cook County, Illinois. Mr. Welford is a world-renowned composer, conductor, orchestrator and music director born in the United Kingdom.  *See* en.wikipedia.org/wiki/Colin_Welford.

6.     Defendant Eliza Tour LLC is a Limited Liability Company organized under the laws of the State of New York, with its principal place of business located at 145 West 45th Street, 7th Floor, New York, New York 10036.  The Eliza Tour LLC entity was created to begin a national tour of the Play in Chicago, Illinois, and therefore transacts business in the State of Illinois.[1] However,  Eliza Tour is not authorized to transact business in the State of Illinois in violation of the Limited Liability Company Act, 805 ILS 180/45-1 *et seq*. (the "LLC Act").  Eliza Tour has therefore appointed the Illinois Secretary of State as its agent for the purpose of service of process pursuant to the LLC Act.  805 ILCS 180/45-45(c).  Thus, Eliza Tour may also subject to suit under the LLC Act by the Illinois Attorney General to recover all unpaid fees, as well as penalties. 805 ILCS 180/45-45(d).

7.     Defendant Chicago Federation of Musicians, Local No. 10-208 (the "Union"), is an Illinois not-for-profit corporation and a local chapter of the American Federation of Musicians

---

[1] Eliza Tour, at times referred to herein as the "Hamilton Producers," shares the same principal place of business as its shareholders, parent corporation, agents and related entities. Eliza Tour is also operated by same shareholders, officers and agents as those of its parent corporation and related entities, which include all other U.S. productions of the Play.
.

union ("AFM"), with its principal office located at 656 West Randolph Street, Suite 2W, Chicago, Illinois 60661. The Union is a labor organization within the meaning of Section 301 of the LMRA.

### Facts Common to All Counts

8. On or about July 18, 2016, Hamilton Producers employed Mr. Welford as a Musical Director and Conductor to tour its Broadway play outside of New York City, New York, with Chicago being the point of origin for purposes of the first national tour, which offer Mr. Welford accepted. At that time, Mr. Welford was a resident of New York City, New York.

9. Based on the promises made on or about July 18, 2016, Mr. Welford executed and entered into a written employment agreement (the "Contract") and committed himself to tour the Play in Chicago and beyond, a true and correct copy of the Contract is attached hereto as **EXHIBIT A**, and incorporated herein by reference.

### *The Contract*

10. Through the Contract, Mr. Welford was engaged "as the music director/conductor, as customarily defined in the industry, of the music to be included in Producer's first-national tour production of the Play . . ." and Mr. Welford agreed to "accept such engagement, upon all terms and conditions [t]herein set forth and perform all duties associated with the position throughout the entirety of the rehearsal and performance period for the Chicago engagement[.]" Thereafter, it was understood that Mr. Welford would remain employed and his "salary shall not be diminished due to the minimums of the new prevailing local agreement" once the Play toured away from Chicago and fell outside of the auspices of the Union. Exhibit A, §§ 1, 9.2.

11. The musical theatre industry defines the term "music director/conductor" as the person responsible for the musical aspects of a production, and who also serves as the conductor and often the rehearsal pianist. *See* en.wikipedia.org/wiki/Music_director. *See also*

lexico.com/en/definition/musical_director ("The person responsible for the musical aspects of a performance or production, typically the conductor or leader of a music group").

12.    The Contract required Mr. Welford to relocate from New York, where he owned property and resided, and establish residency in Chicago, Illinois to perform the duties required. Exhibit A, §§ 1, 2.4 and 3.2.

13.    The Contract further envisioned and required Mr. Welford's "obligations and services" under the Contract to be unassignable and nondelegable and that these services would continue past the Chicago engagement as part of the "first-national tour production of the Play." Exhibit A, §§ 1, 9.2 – 9.3.

14.    Indeed, it is the custom and practice within the theatre industry and Broadway for successful productions like Hamilton to tour and/or relocate to other cities, nationally and abroad. In such event, operative contracts, like the Contract here, would continue to provide a music director or conductor employment and compensation for any subsequent tour legs absent a formal abandonment of the Play. This was fully contemplated by the Hamilton Producers.

15.    It was the express understanding of Mr. Welford and the Hamilton Producers, that should the run of the Play in Chicago be successful, as it indisputably turned out to be, that the national tour would not be abandoned and Mr. Welford's employment as the music director/conductor would continue past the Chicago engagement to any subsequent tour legs which Hamilton Producers expected to be at least ten years.[2]

---

[2] "'Hamilton' could easily run on Broadway for a decade or more. In September, the first road production will open in Chicago, and it will be a 'sit down' show, meaning it is intended to stay there for a year or more. Ultimately, there may be as many as seven 'Hamilton' companies, in addition to the one on Broadway, performing at the same time in multiple American and international cities. Ticket revenues, over time, could reach into the billions of dollars. If it hits sales of a mere $1 billion, which 'Hamilton' could surpass in New York alone, the show will have generated roughly $300 million in profit on the $12.5 million put up by investors. (There are many eye- popping numbers to contemplate, but maybe the most striking one is this: The show is averaging more than $500,000 in profit every week.)" The C.E.O. of 'Hamilton' Inc. - The New York Times, April 6, 2016 (Interview of Hamilton individual producer Jeffrey Seller).

16. The Contract required Mr. Welford to be compensated pursuant to the amounts stated therein, which included prevailing rates and compensation established by the Union, such as: "the Applicable CFM rate," the CFM-Assigned Principal Pool Payment," the "Current/Prevalent CFM Minimum Payment," annual increases "as defined by the CFM," and "applicable CFM benefits and taxes." Exhibit 1, § 2.

17. Section 9.1 of the Contract provides:

> This Agreement supersedes all prior agreements between the parties with respect to the subject matter hereof, and together with the CFM/BIC Agreement, constitutes the entire agreement between the parties, and shall not be changed or (except as expressly provided herein) terminated orally. Except to the extent that the terms of this Agreement may be more favorable to Music Director than the CFM/BIC Agreement, the terms of the CFM/BIC Agreement shall prevail. No waiver shall be deemed a continuing waiver or a waiver of any preceding or subsequent breach, or a waiver of any other provision.

Exhibit 1, § 9.1.

18. As used in the Contract, the term "CFM" refers to the Chicago Federation of Musicians, here the Union, and the term "CFM/BIC" Agreement refers to a document entitled "Book Show Agreement for Broadway in Chicago, L.L.C." entered into between Broadway in Chicago, L.L.C. ("BIC") and the Union on or about December 17, 2015 (the "CFM/BIC Agreement"). A true and correct copy of the CFM/BIC Agreement is attached hereto as **EXHIBIT B** and incorporated herein by reference.

19. BIC is a theatrical production company formed to present touring Broadway productions in Chicago and manages programing at the Theatres, including the Chicago portion of the national touring production of Hamilton. *See* en.wikipedia.org/wiki/Broadway_In_Chicago.

20. Upon information and belief, Hamilton Producers negotiated and entered into an agreement with BIC regarding the production of the Play while in Chicago. Upon information and belief, BIC became a joint employer of Mr. Welford.

*The CFM/BIC Agreement*

21.     Through the CFM/BIC Agreement, the Union and BIC agreed to enter into a collective bargaining relationship regarding musicians employed by BIC for shows booked at the Oriental Theatre, Shubert/Bank of America Theatre [later re-named The CBIC Theatre] and Palace Theatre (the "Theatres") for the period of January 1, 2016 to January 31, 2020.   Exhibit B, p. 1.

22.     Pursuant to the CFM/BIC Agreement, BIC recognizes the Union as the "sole and exclusive bargaining agent for all Musicians, Conductors, Assistant Conductors, Contractors, and Librarians employed by" BIC for shows performed at the Theatres.  Exhibit B, § 3.

23.     The CFM/BIC Agreement provides:

Any Musician employed after the date of this Agreement who is not a member of the Union at the time of employment shall, as a condition of employment with the Employer, become a member of the Union no later than the 31st day following the commencement of employment, and shall remain a member of the Union during the term of this Agreement.  Union membership is a financial obligation and is required only to the extent that musicians covered by this Agreement must pay the Union's periodic dues and fees or such other amounts as may be authorized.

Exhibit B, § 4.

24.     The CFM/BIC Agreement further provides:

Musicians covered by this Agreement shall be employed for the duration of the show for which they are engaged with the understanding that the Employer may dismiss any such musician for just cause subject to the grievance dispute resolution procedures of this Agreement, and that musicians may be required to commit themselves to perform for the initially planned duration of the show.

Exhibit B, § 4.

25.     The CFM/BIC Agreement contains wage rates of payment for musicians and the Conductor and governs the distribution of the "principal pay pool." A weekly principal pay pool amount was allocated to Mr. Welford. Exhibit B., §§ 8, 9 and 10.

26.     The CFM/BIC Agreement also requires BIC to make pension payments and welfare benefit payments on behalf of Musicians, and to specify the Musician on behalf of whom such payments are made.  These payments were also made on behalf of Mr. Welford. Exhibit B, §§ 12 and 13.

27.     The CFM/BIC Agreement further provides:

All disputes, differences or controversies which may arise between the parties under the terms of this Agreement and which cannot be settled satisfactorily by the parties shall be promptly submitted, at the request of either party, to arbitration by the American Arbitration Association in Chicago, Illinois.  The decision of the Arbitrator shall be final and binding on the parties and their members, and shall not be subject to court review except that either party may petition an appropriate court for enforcement of an award, if necessary.  It is agreed that the oath of an arbitrator required by law is hereby expressly waived.  The costs of arbitration shall be borne equally by the parties.

 Exhibit B, § 16.

28.     The CFM/BIC Agreement requires BIC to "deduct from the member's weekly pay 3% of Gross Wages" and to "remit 3% to the Chicago Federation of Musicians as payment toward the Member's Union dues and assessments."  These deductions were taken from Mr. Welford's weekly pay.  Exhibit B, § 19(I).

29.     The Agreement requires that "[a]ll programs shall contain the statement 'All Musicians are Members of the Chicago Federation of Musicians, Local 10-208' and shall list the names of the Conductor, Contractor and Musicians[.]"  Exhibit B, § 19(J).

30.     The Agreement further provides that BIC:

may employ a Musical Supervisor to oversee all music related functions at the Theatres, including the duties and responsibilities commonly performed by a music contractor.  The Musical Supervisor shall be a management employee, but [BIC] agrees to consult with the Union in the selection of the Musical Supervisor.

Exhibit B, § 5.

8

31.     For purposes of the Play, BIC did not employ a Musical Supervisor to fulfill the role described in the CFM/BIC Agreement. The Music Supervisor for the Play worldwide, and at all relevant times, was Alex Lacamoire, a resident of New York. As the "Conductor" Mr. Welford was neither a manager nor a supervisor.

*Mr. Welford Employment with Hamilton*

32.     After the execution of the Contract, and as a condition of his employment, Mr. Welford was required to relocate to Chicago and become a member of the Union, which included, in addition to performing his contractual duties, the additional obligation to pay the Union 3% of his gross wages.

33.     Mr. Welford's gross wages generated from the Play were subjected to Union withholding from each of his paychecks, and such amounts were remitted to the Union as payment as required by the CFM/BIC Agreement.

34.     Had Mr. Welford not been contractually required to become a member of the Union as a condition of his employment for the Play, Mr. Welford would have not agreed to become a member of the Union and would not have consented to the deduction of 3% of his gross wages to the Union as dues and assessments.

35.     Among other acts and omissions, by requiring and accepting Union dues in relation to his work on Hamilton, the Union and Hamilton Producers represented to Mr. Welford that he was subject to the terms and protections of the CFM/BIC Agreement and otherwise should have reasonably expected to have union protection in regards to his employment at all relevant times.

36.     Mr. Welford reasonably relied upon the representations of longstanding employment and "Union Security" and reasonably believed that he was subject to the terms and

protections of the CFM/BIC Agreement in deciding to execute the Contract, and in performing as contractually required.

37.    Throughout Mr. Welford's employment, pursuant to the Contract, and in working on the Play, he was regarded by Hamilton Producers, the Union, and BIC as the Conductor and required to perform in a keyboard-conductor role, in which he both played the keyboard and conducted the Hamilton orchestra from the first performance of the national tour of the Play in Chicago, and for nearly three years thereafter.

38.    At various times throughout Mr. Welford's employment, he has been addressed by the Union, through its President, and by BIC, through its agent Sarah Cuddihee, as the Conductor and a playing-musician.

39.    At all times during his employment with Eliza Tour, Mr. Welford's gross wages were commensurate with or specifically related to the prevailing wage pay scale. Furthermore, Principal Pool payments were directly allocated to Mr. Welford as the Conductor pursuant to the terms of the CFM/BIC Agreement.

40.    As required by the CFM/BIC Agreement, the playbill for Hamilton listed Mr. Welford as the "Conductor" and stated that "All Musicians are Members of the Chicago Federation of Musicians, Local 10-208."

41.    Throughout his employment, Mr. Welford performed all duties required of him under the Contract and adhered to the CFM/BIC Agreement.

42.    Despite his performance of the Contract and the resounding success of Hamilton in Chicago, as part of its first national tour, on or about July 29, 2018, Mr. Welford was notified by Hamilton Producers that he was to immediately report to their offices in New York by the next day for a disciplinary meeting.

43.     Mr. Welford thereafter immediately requested advice and assistance from the Union on or about July 29, 2018, regarding the Hamilton Producer's request for the in-person disciplinary meeting.

44.     On or about July 29, 2018, the Union's Vice-President, Mr. Leo Murphy, advised Mr. Welford that it was best for Mr. Welford to simply submit to Hamilton Producers' disciplinary meeting and course of conduct despite not having any notice of any alleged wrongdoing or intended disciplinary action. Mr. Welford was not informed that he was not subject to the Union's protection under the CFM/BIC Agreement at this time.

45.     On or about July 30, 2018, Mr. Welford was required to meet with Hamilton Music Supervisor Alex Lacamoire, Hamilton Executive Producer Maggie Brohn of Adventureland, LLC., and Nick Lugo of Baseline Theatrical, an agent for Eliza Tour, and was immediately placed on an unpaid leave of four weeks despite lack of adequate notice, union protection, and his denials of the allegations made at that time. Upon returning from leave, Mr. Welford was further subjected in person to disparaging remarks by the Union President and Vice President in the presence of Hamilton and BIC managers and personnel.

46.     Upon learning, in late February 2019, that he was later the subject of a formal investigation and further disparaging remarks by the Union's President, Mr. Welford engaged the services of an attorney to request that the Union refrain from such unfair practices and to afford him with union protection for purposes of the upcoming investigation.

47.     Mr. Welford's counsel sent correspondence to the Union, via messenger to its President, Ms. Jares, on March 4, 2019, requesting adherence to the CFM/BIC Agreement and requesting information. Upon information and belief, Ms. Jares then shared the communication inappropriately with a friend who is also a Hamilton band member, instead of responding to the

11

March 4, 2019 correspondence. Accordingly, Mr. Welford's counsel sent follow-up correspondence dated March 7, 2019, again enclosing the March 4th correspondence, and requested that Ms. Jares cease and desist from further unfair labor practices including disparaging Mr. Welford. A true and correct copy of the March 4, 2019 correspondence with follow-up correspondence dated March 7, 2019 is attached hereto as **GROUP EXHIBIT C** and incorporated herein by reference.

48.     On March 8, 2019, outside counsel for the Union responded to Mr. Welford's counsel. A true and correct copy of the March 8, 2019 correspondence is attached hereto as **EXHIBIT D** and incorporated herein by reference.

49.     Therein, the Union admitted that Mr. Welford was a member of the Union, but then took the position that Mr. Welford was not covered under the CFM/BIC Agreement and therefore the Union "does not represent him in the *Hamilton* workplace." Exhibit D.

50.     The Union further took the position that "at *Hamilton*, [Mr. Welford] is a supervisor employed by the show" and "that under the National Labor Relations Act, Ms. Jares is afforded an unqualified right to criticize the actions of . . . Mr. Welford in connection with the *Hamilton* workplace." Exhibit D.

51.     However, Mr. Welford was not the Musical Supervisor as defined by the CFM/BIC Agreement nor formally employed as a supervisor by Hamilton.

52.     On March 27, 2019, Mr. Welford's counsel responded to the Union's counsel. A true and correct copy of the March 27, 2019 correspondence is attached hereto as **EXHIBIT E** and incorporated herein by reference.

53.     Therein, Mr. Welford's counsel explained to the Union's counsel, among other things, that the Union had been receiving the required Union dues and assessments from Mr.

12

Welford's wages in accordance with the collective bargaining agreement based upon his work on Hamilton, that Mr. Welford had acted as in a dual capacity role as keyboardist and Conductor at Hamilton, and thus Mr. Welford was entitled to the protection of the Union for his upcoming investigation. *See* Exhibit E.

54.     Counsel for Mr. Welford again requested that the Union's President, Terryl Jares, cease and desist from her efforts to advocate *against* Mr. Welford's employment interests. *See* Exhibit E.

55.     On April 3, 2019, a conference call took place among Ms. Jares, Mr. Kevin Case as counsel for the Union, Mr. Welford and his counsel to request fair and adequate union representation at the upcoming investigation. In that regard, Mr. Welford identified a senior board member from the Union who could provide such union representation on his behalf. However, at that time the Union reiterated its position that it believed it was not required to act on Mr. Welford's behalf as it related to his employment at the Hamilton workplace in Chicago but that it would have to check with the AFM to specifically discuss Mr. Welford and whether Ms. Jares needed to acknowledge him as having collective bargaining rights. Ms. Jares denied Mr. Welford's request for fair and adequate union representation at the upcoming investigation despite agreeing to inform Mr. Welford at a later date as to whether or not he would be afforded Union protection for his employment at the Hamilton workplace in Chicago.

56.     Upon information and belief, the representations made during the April 3, 2019 conference call by the Union and Ms. Jares were in bad faith as Ms. Jares had already consulted with the AFM prior to the April 3, 2019 conference call taking place and was advised that Mr. Welford was covered by the CFM/BIC Agreement. Counsel for Mr. Welford memorialized these actions sounding in bad faith, among others, via correspondence dated April 4, 2019, and relayed

that Mr. Welford would move forward with counsel to represent him at his upcoming internal investigation. A true and correct copy the correspondence dated April 4, 2019 is attached hereto as **EXHIBIT F** and incorporated herein by reference.

57.     On April 5, 2019, Mr. Welford was subjected to a lengthy interview and after a lengthy formal disciplinary investigation the Hamilton Producers determined that Mr. Welford had not engaged in any of the wrongdoing alleged.

58.     Despite being cleared by the internal investigation entirely and being put on notice by Mr. Welford of his claims sounding in discrimination, unfair labor practices, and bad faith, on May 30, 2019, at approximately 11:00 p.m., and right before Mr. Welford was scheduled to leave the U.S. for a planned vacation, Hamilton Producers abruptly terminated Mr. Welford's employment without just cause and instantly replaced him with a new conductor.  Hamilton Producers did so expressly knowing these actions would cause significant personal and professional harm to Mr. Welford. To date, the Union has failed to take any actions on Mr. Welford's behalf as related to his May 30, 2019 termination despite accepting approximately $25,000 in dues pursuant to Mr. Welford's local employment in the Play.

### Count I
### (LMRA Section 301 Claim Against the Union for Breach of Duty of Fair Representation)

59.     Mr. Welford re-states and re-alleges paragraphs 1 through 58 as if fully set forth herein.

60.     At all times relevant hereto, by reason of its acts and omissions, the Union was the exclusive representative of the subject collective bargaining agreement and had a duty to refrain from unfair labor practices and represent Mr. Welford fairly as the Conductor per the collective bargaining agreement and as a unionized employee of the Play.

14

61.     At all times relevant hereto, the Union had a duty to afford Mr. Welford the ability to file a grievance or engage in the "grievance dispute resolution procedure" as provided for in the collective bargaining agreement as a contractual right but never defined or explained therein.

62.     The Union failed in such duty of fair representation.

63.     The Union's conduct towards Mr. Welford was arbitrary, discriminatory and in bad faith.

64.     The acts and omissions of the Union were willful and wanton in disregard of Mr. Welford's rights.

65.     As a direct and proximate result of the Union's breach of its duty and its conduct, Mr. Welford lost wages and other benefits due to him under the Contract, including wages and other benefits to which he is entitled from since June 1, 2019, and has been further deprived of gainful employment as a musician or conductor in the local market.

WHEREFORE, Mr. Welford requests that judgment be entered in his favor and against the Chicago Federation of Musicians, Local No. 10-208, and that he be awarded the following relief:

(a)     Back pay for any wages through the date of trial, at a rate equal to Mr. Welford's average weekly earnings during the period of his employment;

(b)     Front pay for all earnings and other benefits that he would be entitled to;

(c)     Attorney's fees, costs, expenses, and pre-judgment interest;

(d)     Punitive damages; and

(e)     Any other or further relief as the Court deems just and proper.

### Count II
### (LMRA Section 301 Claim Against the Hamilton Producers for Breach of Contract)

66.     Mr. Welford re-alleges the allegations of paragraphs 1 through 65 of Count I as if fully set forth herein.

67. The Contract is a valid and enforceable agreement between Mr. Welford and Eliza Tour.

68. The Contract incorporates the terms of the CFM/BIC Agreement.

69. Pursuant to the Contract, except for any less favorable terms to Mr. Welford contained in the Contract, the terms of the CFM/BIC Agreement prevail.

70. The Contract was only terminable upon abandonment of the national tour of the Play.

71. In breach of the Contract, Eliza Tour terminated Mr. Welford's employment.

72. Based upon its acts and omission, Eliza Tour is estopped from denying that the terms of the CFM/BIC Agreement are applicable to the Contract as if Mr. Welford were employed by BIC.

73. In breach of the Contract, CFM/BIC Agreement, and the implied contractual duty of good faith and fair dealing, Eliza Tour suspended Mr. Welford's employment without pay, terminated Mr. Welford's employment, and without just cause.

74. The acts and omissions of Eliza Tour were willful and wanton in disregard of Mr. Welford's rights under the Contract and the CFM/BIC Agreement.

75. As a direct and proximate result of Eliza Tour's breach of the Contract, Mr. Welford lost wages and other benefits due to him under the Contract, including wages and other benefits to which he is entitled since June 1, 2019.

WHEREFORE, Mr. Welford requests that judgment be entered in his favor and against Eliza Tour, LLC, and that he be awarded the following relief:

(a) Back pay for any wages through the date of trial, at a rate equal to Mr. Welford's average weekly earnings during the period of his employment;

(b)     Front pay for all earnings and other benefits that he would be entitled to;

(c)     Attorney's fees, costs, expenses, and pre-judgment interest;

(d)     Punitive damages; and

(e)     Any other or further relief as the Court deems just and proper.

## Count III
### (Claim Against Hamilton Producers for Violation of the Illinois Wage Payment and Collection Act – 820 ILCS 115/1 *et seq.*

76.     Mr. Welford re-alleges the allegations of paragraphs 1 through 58 of Count II as if fully set forth herein.

77.     At all times relevant hereto, there was a law in existence in the state of Illinois commonly known as the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* (the "IWPCA").  The IWPCA provides, in pertinent part:

> "Every employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period.  Wages of executive, administrative and professional employees, as defined in the Federal Fair Labor Standards Act of 1939, may be paid once a month…"

820 ILCS 115/3.

78.     The IWPCA defines "wages" as:

> "…any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation."

820 ILCS 115/2.

79.     The IWPCA further provides, in pertinent part:

> "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees."

17

820 ILCS 115/14.

80. Eliza Tour failed to pay wages due to Mr. Welford under the Contract during the period of his purported suspension without pay, and has continued to fail to pay Mr. Welford all wages and other compensation due to him through the term of the Contract, which Eliza Tour cannot validly terminate unilaterally.

WHEREFORE, Mr. Welford requests that judgment be entered in his favor and against Eliza Tour, LLC, and that he be awarded the following relief:

(a)     Back pay for any wages through the date of trial, at a rate equal to Mr. Welford's average weekly earnings during the period of his employment;

(b)     Front pay for all earnings and other benefits that he would be entitled to;

(c)     Attorney's fees, costs, expenses, and pre-judgment interest;

(d)     Additional damages pursuant to 820 ILCS 115/14; and

(e)     Any other or further relief as the Court deems just and proper.

**Count IV**
**(State-law Claim Against Hamilton Producers for Breach of Contract)**
**(In the Alternative to Counts I and II)**

81. Mr. Welford re-states and re-alleges paragraphs 1 through 58 as if fully set forth herein.

82. The Contract is a valid and enforceable agreement between Mr. Welford and Eliza Tour.

83. The Contract incorporates the terms of the CFM/BIC Agreement.

84. Pursuant to the Contract, except for any less favorable terms to Mr. Welford contained in the Contract, the terms of the CFM/BIC Agreement prevail.

85. The Contract was only terminable upon abandonment of national tour of the Play.

18

86.     In breach of the Contract and the implied contractual duty of good faith and fair dealing, Hamilton Producers suspended Mr. Welford's employment without pay, and terminated Mr. Welford's employment.

87.     Based upon its acts and omission, Eliza Tour is estopped from denying that the terms of the CFM/BIC Agreement are applicable to the Contract as if Mr. Welford were employed by BIC, even if the collective bargaining provisions of the CFM/BIC Agreement are inapplicable to Mr. Welford.

88.     In breach of the Contract and the CFM/BIC Agreement and the implied contractual duty of good faith and fair dealing, Eliza Tour suspended Mr. Welford's employment without pay, and terminated Mr. Welford's employment without just cause.

89.     The acts and omissions of Eliza Tour were willful and wanton in disregard of Mr. Welford's rights under the Contract and the CFM/BIC Agreement.

90.     As a direct and proximate result of Eliza Tour's breach of the Contract, Mr. Welford lost wages and other benefits due to him under the Contract, including wages and other benefits to which he is entitled to since June 1, 2019.

WHEREFORE, Mr. Welford requests that judgment be entered in his favor and against Eliza Tour, LLC, and that he be awarded the following relief:

(a)     Back pay for any wages through the date of trial, at a rate equal to Mr. Welford's average weekly earnings during the period of his employment;

(b)     Front pay for all earnings and other benefits that he would be entitled to through August 1, 2026;

(c)     Attorney's fees, costs, expenses, and pre-judgment interest;

(d)     Punitive damages; and

(e)     Any other or further relief as the Court deems just and proper.

**Count V**
**(State-law Claim Against the Union and Hamilton Producers for Fraud)**
**(In the Alternative to Counts I and II)**

91.     Mr. Welford re-states and re-alleges paragraphs 1 through 58 and 82 through 90 of Count IV as if fully set forth herein.

92.     To the extent the collective bargaining, grievance and/or termination provisions of the CFM/BIC Agreement are inapplicable to Mr. Welford, the Union and Eliza Tour defrauded Mr. Welford by forcing him to become a Union member and pay Union dues and other assessments.

93.     The Union and Eliza Tour represented to Mr. Welford that the protections of the CFM/BIC Agreement would apply to him in relation to the Contract and his work on Hamilton, while in Chicago, Illinois.

94.     Alternatively, despite the withholding of Union dues from Mr. Welford's paychecks, and the Union's acceptance of those dues, Hamilton Producers and the Union omitted to inform Mr. Welford that the protections of the CFM/BIC Agreement would not apply to him, which fact was material to Mr. Welford in accepting the employment upon the terms in the Contract.

95.     Mr. Welford reasonably relied upon the Union and Eliza Tour's representation and/or silence.

96.     The acts and omissions of the Union and Hamilton Producers were willful and wanton in disregard of Mr. Welford's rights.

97.     As a direct and proximate result of the Union and Eliza Tour's acts and/or omissions, Mr. Welford lost wages and other benefits due to him under the Contract.

WHEREFORE, Mr. Welford requests that judgment be entered in his favor and against the Chicago Federation of Musicians, Local No. 10-208 and Eliza Tour, LLC, and that he be awarded the following relief:

(a)     The amount paid on behalf of Mr. Welford by Eliza Tour, LLC to the Chicago Federation of Musicians, Local No. 10-208;

(b)     Attorney's fees, costs, expenses, and pre-judgment interest;

(c)     Punitive damages; and

(d)     Any other or further relief as the Court deems just and proper.

### Count VI
### (Claim Against the Union for Unjust Enrichment)
### (In the Alternative to Counts I and II)

98.     Mr. Welford re-states and re-alleges paragraphs 1 through 58 and 92 through 97 of Count V as if fully set forth herein.

99.     To the extent the collective bargaining, grievance and/or termination provisions of the CFM/BIC Agreement are inapplicable to Mr. Welford, Eliza Tour conferred a benefit to and enrichment of the Union, on behalf of Mr. Welford, in the form of Union dues and assessments, to which Mr. Welford was otherwise entitled.

100.    The Union knew or should have known that it received Union dues from Eliza Tour for Mr. Welford's benefit, and retained such dues to Mr. Welford's detriment and impoverishment.

101.    The Union's retention of the dues paid by Eliza Tour on Mr. Welford's behalf violates principles of justice, equity and good conscience.

102.    The acts and omissions of the Union were willful and wanton in disregard of Mr. Welford's rights.

103.    As a direct and proximate result of the Union acts and/or omissions, Mr. Welford was damaged.

WHEREFORE, Mr. Welford requests that judgment be entered in his favor and against the Chicago Federation of Musicians, Local No. 10-208, and that he be awarded the following relief:

(a)    The amount paid on behalf of Mr. Welford by Eliza Tour, LLC to the Chicago Federation of Musicians, Local No. 10-208;

(b)    Attorney's fees, costs, expenses, and pre-judgment interest;

(c)    Punitive damages; and

(d)    Any other or further relief as the Court deems just and proper.

## Jury Demand

Mr. Welford demands trial by jury on all issues triable to a jury.

Dated: November 29, 2019                          Respectfully submitted,

                                                  **COLIN WELFORD**

                                                  By: /s/ Juanita B. Rodriguez
                                                  *An Attorney for Colin Welford*

Juanita B. Rodriguez
**JBR Law Group, LLC**
321 S. Plymouth Court, Suite 1250
Chicago, IL 60604
Tel.: (312) 461-1005
Juanita@lawatjbr.com